UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANTHONY J. WRIGHT,

                              Petitioner,

       -v-                                              9:03-CV-0806
                                                       (DNH/GHL)
JOSEPH SMITH, Superintendent,
Shawangunk Correctional Facility,

                              Respondent.
_____

APPEARANCES:                                   OF COUNSEL:

KUBY, PEREZ LAW FIRM                           RONALD L. KUBY, ESQ.
Counsel for Petitioner
119 West 23rd Street
Suite 900
New York, New York 10011

HON. ANDREW M. CUOMO                           G. LAWRENCE DILLON, ESQ.
Counsel for Respondent                         Assistant Attorney General
Office of Attorney General
State of New York
207 Genesee Street
Utica, New York 13501

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

## I.    BACKGROUND

### A.    State Court Proceedings

       According to the testimony adduced at trial, between January 1996 and April 1996,

petitioner Anthony Wright and his co-defendant Lawrence Harris[1] engaged in the sale of crack

_____

       [1] Anthony Wright was also known as "Andrew D. Smith" or "C."  Lawrence Harris was also known
as "Dahu" or "D."  *See* Indictment No. 22-96 (reproduced in Respondent's Appendix on Appeal) ("RA") at

cocaine at the home of James Hill and Hill's fiancee, Sharon Cannizzo, in the Town of Caroga, Fulton County.  *See* Transcript of Trial of Anthony Wright (7/3/97) ("Trial Tr.") at pp. 1022-31.  In early 1996, Hill and Cannizzo, admitted crack cocaine addicts, agreed to allow Wright and Harris to sell cocaine out of their house in exchange for drugs for their own personal use.  Trial Tr. at pp. 849, 1024-29.  Pursuant to the arrangement, Wright and Harris went to Hill's residence at least once per week in order to supply the crack cocaine.  Trial Tr. at pp. 759-60, 1031-32.  Wright and Harris drove an Isuzu Trooper with Virginia license plates and sometimes stayed at the house for several days.  Trial Tr. at pp. 737, 759-60, 1031-32.  Hill took money directly from the customers, went to a designated closed bedroom, turned the money over to Wright and Harris in exchange for the drugs, and returned to the customer with the drugs.  Trial Tr. at pp. 743-48, 786-87, 1032-39.  Cannizzo assisted by letting customers into the house as well as by receiving and placing phone calls to Wright and Harris.  Trial Tr. at pp. 789-91, 795-98.  Hill and Cannizzo contacted Wright and Harris by beeper if they were not in the house when a customer arrived.  Trial Tr. at pp. 791-94, 798-803, 1041-47.  In March 1996 alone, hundreds of these drug transactions occurred.  Trial Tr. at p. 787.  According to both Hill and Cannizzo, they never sold cocaine in their residence during this time period without the assistance of either Wright or Harris.  Trial Tr. at p. 1041.

     On March 9, 1996, local drug addict Robert Warner informed a member of the Fulton County Drug Task Force that drug sales were occurring at the Hill/Cannizzo residence.  Trial Tr. at pp. 410-14, 970-74.  Warner agreed to act as a confidential informant and thereafter participated in three controlled purchases of cocaine from the house.  Trial Tr. at pp. 412-414, 977.  Warner testified that during the buys, he entered the residence and gave money to Hill.  Trial Tr. at pp. 979-

---

RA1-11 ("Indictment").

82.  Hill then left the room and returned with the crack cocaine, which Warner turned over to the police waiting outside.  Trial Tr. at pp. 979-84.  Warner admitted he purchased cocaine at the residence on other occasions for his own personal use.  Trial Tr. at p. 996.  On one occasion, Warner observed "two black guys" at the house in addition to Hill and Cannizzo.  Trial Tr. at pp. 1008-09.

Two other customers not involved in the controlled buys also testified at trial on behalf of the prosecution.  Dan Thum testified that he went to the Hill/Cannizzo residence twenty to thirty times between January and April 1996 to purchase cocaine.  Trial Tr. at p. 1155.  During one purchase in January 1996, he observed the Isuzu Trooper in the driveway of the house and observed two well-dressed black men in the living room watching television.  Trial Tr. at pp. 1161-63.  At trial, Thum identified Harris as one of those men.  *See* Trial Tr. at pp. 1164-68.[2]  Todd Heroth stated he went to the residence approximately twenty times between January and April 1996 to purchase cocaine.  Trial Tr. at p. 1097.  He also saw a maroon four-wheel drive vehicle in the driveway on these occasions.  Trial Tr. at p. 1104.  When he purchased cocaine from Hill on April 2, 1996, Hill, Cannizzo and Harris were at the house.  Trial Tr. at pp. 1098-1103.[3]

On April 3, 1996, Hill, Cannizzo, Wright and Harris were arrested at the residence.  Trial Tr. at pp. 811-15, 1022.  A search disclosed 5.6 ounces of cocaine, an electronic scale, razor blades,

---

[2]  Thum was unable to identify Wright in-person because petitioner, who was free on bail, had absconded by that point in the trial.  *See* Trial Tr. at pp. 1120-30.  However, it appears Thum identified Wright as the second black male in the house from a photograph array.  *See* Trial Tr. at pp. 1167-68.

[3]  The Fulton County Drug Task Force also conducted surveillance of the Hill/Cannizzo residence between January and April 1996.  *See* Trial Tr. at pp. 1222, 1225-26.  While the surveillance officers did not observe Wright or Harris at the residence during the controlled buys, the Isuzu Trooper was observed in the driveway on the dates of the controlled buys and on other occasions during that time period.  *See* Trial Tr. at pp. 413-17, 427, 584, 1233-36.  The Isuzu Trooper was directly linked to Lawrence Harris when Harris was pulled over driving the vehicle on February 1, 1996, with James Hill as his passenger.  *See* Trial Tr. at pp. 1230-33.  However, Harris testified that Wright was the owner of the vehicle.  Trial Tr. at p. 1602.

3

plastic bags and duct tape in the bedroom from which Wright and Harris operated. Trial Tr. at pp. 1283, 1321-22, 1494-95. The police also seized $3646 and a pager from Wright. RA24-26.

Warner testified before a Fulton County grand jury pursuant to a cooperation agreement wherein the prosecution agreed not to bring felony charges for certain conduct he engaged in prior to the controlled buys. Trial Tr. at pp. 1013-15. Hill and Cannizzo also entered into cooperation agreements and testified before the grand jury. Trial Tr. at pp. 811, 1072-73, 1089. Cannizzo pleaded guilty to attempted criminal facilitation and received six months in jail and five years felony probation in exchange for testimony against Wright and Harris. Trial Tr. at pp. 809-11, 926. Hill pleaded guilty to possession of a controlled substance in the second degree and was sentenced to six years to life in exchange for his testimony. Trial Tr. at pp. 1021-22.

On July 24, 1996, a Fulton County grand jury returned a nine count indictment against Wright and Harris. In that accusatory instrument, petitioner and Harris were charged with three counts of criminal sale of a controlled substance in the third degree, three counts of criminal facilitation in the fourth degree, criminal possession of a controlled substance in the first degree, criminal facilitation in the second degree, and conspiracy in the second degree. *See* Indictment at RA1-11. Wright and Harris[4] pleaded not guilty on all charges and proceeded to trial. Arraignment at RA47. Wright subsequently moved for a severance of his trial from that of Harris, which the County Court denied. Trial Tr. at pp. 4-8, 51.

The trial commenced on June 27, 1997 in Fulton County Court with County Court Judge Angelo D. Lomanto presiding. While Harris testified in his own defense, Wright did not. Trial Tr.

---

[4] Neither the record before this Court nor the record accompanying defendant Harris' habeas petition specifies Harris' plea. However, since Harris proceeded to trial, the Court assumes he pleaded not guilty to the above charges.

at pp. 1547-1609.  Harris testified he visited the Caroga Lake house on only three occasions, and he made no statements directly implicating himself or Wright in the drug sales.  Trial Tr. at pp. 1571, 1550-1608.

Several days into the trial, sworn juror Carol Lamb requested to speak with Judge Lomanto.  Trial Tr. at p. 631.  Accordingly, Judge Lomanto conducted an *in camera* questioning of Ms. Lamb in the presence of both defense counsel, the District Attorney, and the Court Clerk.  Trial Tr. at p. 631.  Ms. Lamb stated that before she was sworn as a juror, a woman with four children sat next to her in the courtroom.[5]  Trial Tr. at pp. 631-32.  The woman informed Ms. Lamb that she needed a place to stay, and Ms. Lamb responded by providing her with names of local hotels.  Trial Tr. at pp. 632-33.  In that list, Ms. Lamb included the name and phone number of a lodging facility where her husband was the manager.  Trial Tr. at p. 633.  Ms. Lamb informed the court that, after she was selected as a juror,

> it clicked in my head what I had done and if that was not maybe a good idea.  Really though the only thought that came to me at that point was if they lost the case, would there be any thought of retaliation against me now that I've given her my phone number and address and name.  But I just thought well I'll just have to live with that, there's nothing I can do.

Trial Tr. at p. 634.

A couple of days later, Ms. Lamb saw the woman in the hall with petitioner.  Trial Tr. at pp. 634-35.  The woman smiled at Ms. Lamb, and although Ms. Lamb felt awkward, she returned the smile and politely asked whether she found a place to say, to which the woman responded she had.  Trial Tr. at pp. 634-35.  Ms. Lamb noted she did not look at petitioner.  Trial Tr. at p. 635.  Ms.

---

[5]  In his own petition for habeas corpus relief, co-defendant Lawrence Harris claims that the woman Ms. Lamb encountered was his wife.  *See Harris v. Smith*, No. 04-CV-1268 (LEK)(GJD), Petition (Dkt. No. 1) at p. 5.

Lamb informed the court that the "only impact" she felt was to "have a little bit of concern."  Trial Tr. at p. 636.  She further stated that "it wouldn't change the way I would vote or my impartiality at all.  The only thing it could possibly do is make me feel a little more concerned for my safety in the future.  But I don't think that's a valid thing to base decisions on."  Trial Tr. at p. 636.

William Martuscello, defense counsel for Wright, also questioned Ms. Lamb, as did William Lorman, counsel for Harris.  Trial Tr. at pp. 639-50.  In addition, Fulton County District Attorney Polly Hoye ("DA Hoye") examined Ms. Lamb.  Trial Tr. at pp. 650-51.  Neither Martuscello nor Lorman objected to conducting the hearing *in camera* or in the absence of the defendants.  Trial Tr. at pp. 630-82.  Ms. Lamb repeatedly assured the court and counsel that while she had a "teeny bit" of concern for her safety, she would be fair and impartial in rendering a verdict.  Trial Tr. at pp. 636-37, 642, 647-51.

Ms. Lamb further mentioned she shared her concern regarding the incident with juror Sharon Benson in the presence of a male juror, whom she did not know by name.  Trial Tr. at pp. 637-41.  At the request of Attorneys Martuscello and Lorman, Judge Lomanto conducted further inquiry of several other jurors, including Ms. Benson, to determine whether Ms. Lamb's sharing the incident with them affected their ability to remain fair and impartial.  Trial Tr. at pp. 653-54.  Ms. Benson indicated she had no concerns for her personal safety, and her knowledge of Ms. Lamb's contact with the woman would not affect her own ability to be fair and impartial.  Trial Tr. at p. 656.  When asked by Judge Lomanto whether anyone overheard a conversation between Ms. Lamb and Ms. Benson, no juror responded in the affirmative and the court was unable to determine which male juror, if any, had been present when Ms. Lamb initially informed Ms. Benson of the incident.  Trial Tr. at pp. 671-682.

It appears that Wright and Harris were brought into chambers following the inquiries of the jurors. Trial Tr. at p. 682. Counsel then recounted the circumstances of the hearing in the presence of Wright and Harris as well as made motions for a mistrial and disqualification of Ms. Lamb and Ms. Benson. Trial Tr. at pp. 682-89. Wright and Harris expressed assent to their counsel's motions for a mistrial. Trial Tr. at p. 689. The trial court denied the mistrial motions and refused to disqualify any jurors. Trial Tr. at pp. 690-91.

After the hearing, the trial proceeded. However, three days before the verdict, Wright, who was free on bail, absconded. Trial Tr. at pp. 1120-30. After efforts to locate Wright failed, the trial continued in his absence. Trial Tr. at pp. 1135-44. At the conclusion of trial, Wright and Harris were found guilty on all nine counts. Trial Tr. at pp. 1791-95. On July 30, 1997, Harris was sentenced as a second felony offender to various terms of imprisonment amounting to sixty-two and a half years to life. RA584-87. On August 6, 1997, Wright was sentenced *in abstentia* to an aggregate term totaling fifty years to life. *See* Sentencing Transcript ("Sentencing Tr.") at pp. 32-35.[6]

Wright and Harris successfully moved to consolidate the appeals of their convictions and sentences to the New York Supreme Court, Appellate Division, Third Department. *See* Decision and Order dated January 5, 2001. On November 15, 2001, that court affirmed the convictions in all respects. *People v. Harris*, 288 A.D.2d 610 (3d Dept. 2001). However, in the interests of justice, the Appellate Division mandated their sentences run concurrently, reducing the terms to twenty-five

---

[6] Eventually, Wright was located and pleaded guilty to bail jumping in the first degree. *See* Respondent's Appellate Brief ("Resp. App. Br.") at p. 12, n.5; *see also* Petition, ¶ 17. He was sentenced to an indeterminate term of one to three years imprisonment to run consecutively to the sentence he received *in abstentia*. *See* Resp. App. Br. at p. 12, n.5.

years to life.  *Id.* at 618-20.  The New York Court of Appeals granted Wright and Harris's request

for leave to appeal on January 22, 2002.  *See* Order Granting Leave dated January 22, 2002.  On

November 21, 2002, the Court of Appeals affirmed the order of the Appellate Division in all

respects.  *People v. Harris*, 99 N.Y.2d 202 (2002).

### B.    Proceedings in this Court

_____Wright commenced this action, through counsel, on June 30, 2003 in the Northern District

of New York.  *See* Petition and Supporting Memorandum of Law ("Pet. Mem.") (Dkt. No. 1).[7]  __

In his petition, Wright asserts four separate grounds in support of his request for federal

habeas intervention.  Specifically, Wright argues that: (i) he received ineffective assistance of trial

counsel because his court-appointed attorney labored under a conflict of interest; (ii) the trial court

improperly excluded him from a portion of his trial when it conducted a fact-finding hearing into the

potential tainting of a sworn juror; (iii) the trial court improperly permitted that tainted juror to

remain on the jury; and (iv) he was unfairly prejudiced by the admission of testimony of two

---

[7]  Wright styles his request for relief as a petition for a writ of habeas corpus pursuant to 28 U.S.C.
§§ 2241 and 2254 *et seq.  See* Dkt. No. 1.  Section 2254 governs petitions filed by "a person in custody
pursuant to the judgment of a State court only on the ground that he is in custody in violation of the
Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  While Section 2241 also may be
invoked by prisoners "in custody in violation of the Constitution or laws or treaties of the United States," *see*
28 U.S.C. § 2241(c)(3), that section generally is used to challenge the execution of a ***federal*** sentence, when
the underlying conviction is not contested.  *See Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997)
("A challenge to the *execution* of a sentence . . . is properly filed pursuant to Section 2241.") (emphasis in
original); *see also James v. Walsh*, 308 F.3d 162, 166-67 (2d Cir. 2002); *Carmona v. United States Bureau
of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001).  In his petition, Wright plainly disputes his continuing custody
pursuant to a state court conviction.  Such a challenge is properly brought under Section 2254, rather than
Section 2241.  Accordingly, this Court treats Wright's application as arising under Section 2254.  *See
James*, 308 F.3d at 166 (stating that "it is the substance of the petition, rather than its form" that controls);
*cf. Cook v. New York State Div. of Parole*, 321 F.3d 274, 278 (2d Cir. 2003) (finding that state prisoner's
challenge to parole revocation was properly brought under Section 2254, and noting that "if an application
that should be brought under 28 U.S.C. § 2254 is mislabeled as a petition under section 2241, the district
court must treat it as a section 2254 application instead").

prosecution witnesses and by the prosecutor's comments during summation.  *See* Petition, Grounds One through Four.[8]  Then-United States Magistrate Judge Gary L. Sharpe directed the respondent to file a response to the petition, Dkt. No. 2, and on December 15, 2003, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer and memorandum of law, together with pertinent state court records, in opposition to Wright's pleading.  Dkt. No. 6.  In opposing Wright's petition, respondent argues that petitioner's claims under grounds one through four lack merit, and additionally, ground four is not cognizable for review in a habeas proceeding.  *See* Dkt. No. 6 ("Resp. Mem.").  Through counsel, Wright thereafter submitted a traverse in further support of his application.  *See* Dkt. No. 7.  By Order dated February 13, 2004, the Hon. Frederick Scullin, Jr., Chief Judge, re-assigned this matter to this Court for the issuance of a report and recommendation, *see* Dkt. No. 8, which this Court now issues pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c).[9]_____

## II.   **DISCUSSION**

### A.   **Applicable Standard of Review**

In *Hawkins v. Costello*, 460 F.3d 238 (2d Cir. 2006), the Second Circuit observed that under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> a federal court may grant a writ of habeas corpus if the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, Federal law, as determined by the Supreme Court of the United States" .

---

[8]  In his petition, Wright lists his four grounds for relief at paragraph 12, A through D.  *See* Petition, ¶ 12.  For ease of reference, the Court has consecutively numbered Grounds "A through D" as Grounds "One through Four."

[9]  Of note, on January 27, 2005, Wright filed a notice of appearance/substitution of counsel replacing his original counsel, Daniel R Williams, Esq., with Ronald L. Kuby, Esq. of Kuby & Perez, LLP. Dkt. No. 9.

. . [or] if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Hawkins*, 460 F.3d at 242, 242 n.1 (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003). The AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry*, 403 F.3d at 66; *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).

"A state court adjudication is 'contrary to' federal law if it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if it decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Hawkins*, 460 F.3d at 242 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). Under the "unreasonable application" clause of the AEDPA, a federal habeas court may grant the writ only where the state court's decision "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. A federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams*, 529 U.S. at 409; *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001). The *Hawkins* court noted that although "'[s]ome increment of incorrectness beyond error'" is required in order to grant a federal habeas application, that increment "'need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Hawkins*, 460 F.3d at 243 (quoting *Francis S. v. Stone*, 221

10

F.3d 100, 111 (2d Cir. 2000)).

### B.    Ineffective Assistance of Counsel

_____In the first ground of his habeas petition, Wright alleges that he received ineffective

assistance of counsel because his court-appointed attorney, William Martuscello, labored under a

conflict of interest which adversely affected his legal representation.  *See* Petition, Ground One.

Specifically, petitioner asserts that Martuscello previously represented prosecution witness James

Hill on unrelated parole violations, thereby creating a conflict of interest.  *Id.*  According to

petitioner, the fact that Hill consented to cross-examination by Martuscello did not cure the conflict.

*Id.*  Moreover, Wright claims that the trial court's failure to probe the extent of Martuscello's

attorney-client relationship with Hill, and to inquire whether Wright was aware of this past

representation, adversely affected the defense.  *Id.*

Both the Appellate Division, Third Department and the New York Court of Appeals rejected

Wright's conflict of interest claim.  *Harris*, 99 N.Y.2d at 210-12; *Harris*, 288 A.D.2d at 614-15.

These courts reasoned that Martuscello's past representation of Hill was merely a potential conflict

alleviated by Hill expressly consenting to Martuscello's use of privileged information obtained

during the course of their attorney-client relationship.  *Harris*, 99 N.Y.2d at 210-12; *Harris*, 288

A.D.2d at 614-15.  The Court of Appeals, in the last reasoned state court decision in this case,[10]

---

[10]  Respondent devotes a significant portion of his brief to reiterating the Appellate Division, Third Department decision and incorrectly states that petitioner's leave application to the New York Court of Appeals was denied.  *See* Resp. Mem. at pp. 5-15.  Contrary to respondent's representations, this Court must examine the decision of the New York Court of Appeals, as the last state court adjudication of petitioner's claims, to determine whether it was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  *See Coleman v. Thompson,* 501 U.S. 722, 735 (1991) ("In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims . . . a federal court may address the petition.").

affirmed the intermediate appellate court's determination on this issue as follows:

      Wright has demonstrated the existence of a potential conflict of interest since his trial attorney, Martuscello, previously represented an important prosecution witness. However, the record supports the conclusion that the potential conflict did not operate on the defense.  Here, Hill expressly consented to cross-examination by his former attorney, who questioned Hill concerning his prior felony convictions and his motivation for testifying.  His waiver of the attorney-client privilege terminated any duty of confidentiality owed to him by Martuscello and Hill's consent to cross-examination obviated any potential conflict.  Hill had also been fully cross-examined by codefendant Harris's attorney, William Lorman.

      Defendant Wright further contends that County Court erred by not conducting an inquiry into Martuscello's previous representation of Hill.  A trial judge who is aware of a situation where a conflict may exist has an obligation "to conduct a record inquiry of each defendant whose representation is potentially conflict-ridden in order to ascertain whether he or she 'has an awareness of the potential risks involved in that course and has knowingly chosen it.'"  However, the failure to make such an inquiry is reversible error only when defendant has established the existence, or probable existence, of a conflict of interest, "which bears a substantial relation to 'the conduct of the defense.'"  Since there is no indication here that the potential conflict bore a "substantial relation" to the representation, the trial court did not commit reversible error, although the better practice would have been to conduct a hearing.

      In short, . . . defendant Wright was [not] denied effective assistance of counsel given that . . . the alleged conflict[] of interest did not impact adversely on the defense. Defendant[], thus, did not suffer a Federal Sixth Amendment violation or a state constitutional violation based on ineffective assistance of counsel.

*Harris*, 99 N.Y.2d at 211-12 (citations omitted).

## 1.     <u>Clearly Established Supreme Court Precedent</u>

      The Sixth Amendment to the United States Constitution provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  A defendant's Sixth Amendment right to counsel guarantees the right to conflict-free representation.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative

right to representation that is free from conflicts of interest."); *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980).  Three types of conflicts of interest may arise in the course of legal representation: (1) a *per se* conflict;[11] (2) an actual conflict; or (3) a potential conflict.  *Armienti v. United States*, 234 F.3d 820, 823-24 (2d Cir. 2000).[12]

In *Cuyler v. Sullivan*, the Supreme Court asserted that to establish a violation of the Sixth Amendment, "a defendant who raised no objection at trial must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance."  *Sullivan*, 446 U.S. at 348-49 (emphasis added).  This standard "is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect."  *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  Rather, an "'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."  *Id.*  An actual conflict of interest may not be "a mere theoretical division of loyalties," *id.* at 170, but must amount to an "actual lapse in representation" and result from an attorney "actively represent[ing] conflicting interests," *Sullivan*, 446 U.S. at 349.[13]

_____

[11]  A *per se* conflict of interest exists in only two limited circumstances, and requires automatic reversal of a conviction without a showing of prejudice: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which his client is on trial.  *Armienti*, 234 F.3d at 823.  Neither of these circumstances is present in the instant case.

[12]  Whether a conflict of interest exists is a mixed question of law and fact.  *See Sullivan,* 446 U.S. at 342; *see also United States v. Feyrer*, 333 F.3d 110, 115-16 (2d Cir. 2003).

[13]  The meaning of "actively represent[ing] conflicting interests" is not clear under existing Supreme Court precedent.  In *Mickens*, the Supreme Court indicated that *Sullivan* "stressed the high probability of prejudice arising from multiple *concurrent* representation."  *Mickens*, 535 U.S. at 175 (emphasis added).  However, the Court refused to suggest that an attorney's ethical duty in that situation is any "more or less important" than the ethical duty resulting from *successive* representation, as present here.  *Id.* at 175-76.  Based on *Mickens*, it is possible that an actual conflict arises only in cases of concurrent representation of clients with conflicting interests, or in cases of successive representation on related matters.  *See, e.g., United States v. Pizzonia*, 415 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) (noting, in the disqualification context, that "[t]he majority of cases that have found a conflict of interest arising from prior representation of a witness involve substantially related representations") (collecting cases).  However, this issue remains

According to the Second Circuit's interpretation of this Supreme Court precedent, a

defendant may demonstrate that an actual conflict of interest adversely affected his counsel's

performance by showing that "'during the course of the representation, the attorney's and

defendant's interests diverge with respect to a material factual or legal issue or to a course of

action.'" *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003) (quoting *United States v.

Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002)).[14]  To establish how his interests and those of his attorney

diverge, a defendant need only demonstrate that "'some plausible alternative defense strategy or

tactic might have been pursued, and that the alternative defense was inherently in conflict with or

not undertaken due to the attorney's other loyalties or interests.'" *Id.* at 116 (quoting *Schwarz*, 283

F.3d at 92); *see also Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005); *United States v. Blau*,

159 F.3d 68, 75 (2d Cir. 1998).[15]  A plausible alternative defense strategy need not be successful or

---

unresolved.  This Court, therefore, does not consider the fact that this case involves Martuscello's successive
representation of Hill on a substantially unrelated matter as determinative on the issue of whether an actual
conflict of interest exists.

[14]  The AEDPA requires federal courts to examine Supreme Court precedent to determine whether a
state court decision contravened "clearly established Federal law."  *See* 28 U.S.C. § 2254(d)(1).  However,
federal habeas courts may consider the decisions of lower federal courts as "helpful amplifications of
Supreme Court precedent" in "evaluating whether the state court's application of the law was reasonable."
*Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc); *see also Lopez v. Artus*, No. 03 Civ.
7087, 2005 WL 957341, at *6 n.5 (S.D.N.Y. Apr. 25, 2005); *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 248
n.10 (S.D.N.Y. 2002), *aff'd*, 66 Fed.Appx. 277 (2d Cir. 2003) (indicating that a district court is not
"required, or even permitted, to disregard the Circuit's interpretation of 'clearly established Federal Law, as
determined by the Supreme Court'").  Therefore, in the absence of significant Supreme Court jurisprudence
regarding actual conflicts of interest, it is helpful to examine decisions of inferior federal courts interpreting
the pertinent Supreme Court precedent to determine whether the state court's adjudication was unreasonable
under 28 U.S.C. § 2254(d)(1).

[15]  The Second Circuit has noted that the circuits are divided regarding how a defendant can
establish that a conflict adversely affected his counsel's performance.  *See Eisemann*, 401 F.3d at 107.  This
circuit applies a more lenient standard, requiring proof that counsel failed to pursue any plausible alternative
defense strategy as a result of the conflict.  *Id.*  In contrast, other circuits employ a stricter approach,
requiring a defendant to demonstrate counsel's failure to pursue an "objectively reasonable" alternative
defense strategy.  *Id.* at 107-08 (citing *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004) and *Quince*

even reasonable, but simply must possess "sufficient substance to be a viable alternative." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993); *see also Eisemann*, 401 F.3d at 107.  While the line between an actual and a potential conflict of interest is not always apparent, *see United States v. Cruz*, 982 F. Supp. 946, 948 n.6 (S.D.N.Y. 1997), a potential conflict exists "if the interests of the defendant *could* place the attorney under inconsistent duties in the future," *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (emphasis in original) (citation omitted).

Typically, a defendant alleging ineffective assistance of counsel is required to show both: (1) that counsel's representation fell below an objective standard of reasonableness, measured in the light of prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 46 U.S. 668, 688-90 (1984); *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  However, a defendant who proves that an actual conflict of interest affected the adequacy of his representation need not demonstrate prejudice. *Sullivan*, 446 U.S. at 350.[16]  On the other hand, a defendant who has established a potential conflict of interest is required to

---

*v. Crosby*, 360 F.3d 1259, 1264-65 (11th Cir. 2004)).

[16]  To date, the Supreme Court has applied this presumption of prejudice only in cases involving an attorney's concurrent representation of clients with conflicting interests.  *See Mickens*, 535 U.S. at 176 ("In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation.  Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question."); *see also Eisemann*, 401 F.3d at 108.  As previously mentioned, the Supreme Court has stressed the likelihood of prejudice resulting from concurrent representation and the difficulty of proving that prejudice.  *See id.* (citing *Sullivan*, 446 U.S. at 348-49 and *Holloway v. Arkansas*, 435 U.S. 475, 490-91 (1978)); *see also supra* at note 13. However, according to the *Mickens* Court, the language of *Sullivan* does not clearly establish or even support an expansive application of the prejudice presumption to, as present here, conflicts involving former clients.  *Id.* at 174.  This lack of clearly established Supreme Court precedent is not problematic for this Court's analysis, as the Court concludes below that there is no evidence of an actual conflict of interest in the present case.

15

demonstrate prejudice in accordance with *Strickland* in order to prove that the conflict violated his right to effective assistance of counsel. *Winkler*, 7 F.3d at 307 (citing *Strickland*, 466 U.S. at 688-90); *see also Sullivan*, 446 U.S. at 350 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").

The Supreme Court further has established that a trial court's failure to conduct an inquiry to determine whether the defendant is aware of a possible conflict of interest does not by itself result in a constitutional violation requiring automatic reversal of the conviction. *See Mickens*, 535 U.S. at 173-74. Rather, even in the absence of a trial court inquiry, a defendant still must establish that the conflict adversely affected counsel's performance to obtain reversal of his conviction. *Id.* ("[T]he trial court's failure to make the . . . inquiry does not reduce the [defendant's] burden of proof; it [i]s at least necessary, to void the conviction, for [the defendant] to establish that the conflict of interest adversely affected his counsel's performance."). In *Mickens*, Justice Kennedy emphasized:

> The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures. . . As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation.

*Id.* at 179 (Kennedy, J., concurring).

## 2.     Contrary To, or Unreasonable Application Of, Supreme Court Precedent

The facts surrounding petitioner's conflict of interest claim emerged during Hill's trial testimony. Specifically, following the cross-examination conducted by Attorney Lorman, *see* Trial Tr. at pp. 1065-91, 1093-94, Martuscello commenced his cross-examination of Hill as follows:

16

> Q:      Mr. Hill, do you recognize me?
>
> A:      I know you.
>
> Q:      Did I ever represent you?
>
> A:      Sure you have.
>
> Q:      When was that?
>
> A:      I believe on two parole violations in the 90's sometime.

Trial Tr. at pp. 1081-82.  Martuscello then asked to approach the bench, and during an off-the-

record sidebar, Judge Lomanto apparently suggested that Martuscello's cross-examination of Hill

was not problematic as long as Hill waived attorney-client privilege.  Trial Tr. at p. 1149.[17]

Martuscello then continued his cross-examination, inquiring:

> Q:      Mr. Hill, the canons of the New York State Bar prohibit a lawyer from using any
>         confidences or privileged information against a client and that continues with a
>         former client.  So my question to you is do you have a problem if I cross-examine
>         you and use any information that I may have had from prior representation of you?
>
> A:      I have no problem with that.

Trial Tr. at p. 1082.

> ### (i)      **Potential Conflict of Interest**

As a preliminary matter, it is doubtful that Martuscello's prior representation of Hill created

anything more than a potential conflict which was averted by Hill's consent to cross-examination.

---

[17]  During petitioner's trial, Judge Lomanto indicated that the courtroom was not designed to facilitate the contemporaneous recording of sidebar conferences.  *See* Trial Tr. at pp. 842-43.  As a result, counsel agreed to place the sidebars on the record after they occurred.  Trial Tr. at pp. 843-44.  Several days after Martuscello's cross-examination of Hill, counsel placed on the record the sidebar involving the conflict of interest issue.  *See* Trial Tr. at pp. 1146-47, 1149.  Based on this Court's review of the record, it appears that Judge Lomanto saw no problem with any possible conflict if Hill waived his attorney-client privilege. *See* Trial Tr. at p. 1149.

A defense attorney's prior representation of a testifying government witness creates the potential for a conflict of interest because the attorney's duties of loyalty and confidentiality to his clients persist even after termination of the representation. *See United States v. Yannotti*, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004); *see also United States v. Leslie*, 103 F.3d 1093, 1098-99 (2d Cir. 1997); *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir. 1995). The Second Circuit has acknowledged that "[w]hen a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist." *Lussier*, 71 F.3d at 462. Three potential areas of conflict may arise: (1) "the attorney's pecuniary interest in furthering his business relationship with the government witness may impair his ability to cross-examine the witness zealously"; (2) "the attorney may misuse confidential information obtained from the [witness], or may fail to fully cross-examine for fear of misusing confidential information"; or (3) "the attorney may be required to testify about material aspects of the witness' testimony, or otherwise place his own credibility at issue in cross-examining the witness or in attacking the witness' testimony in summation." *Anwar v. United States,* 648 F. Supp. 820, 826-27 (N.D.N.Y. 1986) (citations and quotations omitted) (Munson, C.J.), *aff'd,* 823 F.2d 544 (2d Cir.1987).

However, where the former client waives the attorney-client privilege on cross-examination, the risk of a conflict is "significantly diminished," and at worst, results only in a potential conflict of interest. *Lussier*, 71 F.3d at 461-62 (stating that conflict was at worst potential where former client, who was a witness against the defendant, waived his attorney-client privilege as to his prior communications with former counsel); *see also United States v. Thomas*, Nos. 98-1051, 98-1052, 98-1116, 2000 WL 236481, at *3 (2d Cir. Feb. 14, 2000) (slip opinion) (finding no actual or potential conflict where defense counsel previously represented at least three government witnesses

in unrelated cases and the witnesses had waived their attorney-client privileges with defense counsel for cross-examination purposes); *Leslie*, 103 F.3d at 1098-99 (finding no actual or potential conflict where defense counsel previously represented client's co-defendant in an unrelated investigation but co-defendant waived attorney-client privilege on cross-examination, and stating that if a conflict was assumed, it "could only be regarded as potential"); *cf. United States v. Pizzonia*, 415 F. Supp. 2d 168, 178-79 (E.D.N.Y. 2006) ("Limited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict.") (citing *United States v. Paone,* 782 F.2d 386, 393 (2d Cir.1986)).

By consenting to cross-examination, Hill waived any attorney-client privilege that could have hampered Martuscello's cross-examination.  Upon receiving Hill's consent, Martuscello was free to conduct an uninhibited inquiry of Hill, and to use privileged secrets and confidences obtained in the course of their attorney-client relationship.  As such, Martuscello did not confront conflicting loyalties.  Martuscello appeared to face no conflict at all upon receiving Hill's consent, or at worst, merely a potential conflict.  *See Lussier*, 1 F.3d at 461-62; *see also Thomas*, 2000 WL 236481, at *3; *Leslie*, 103 F.3d at 1098-99.  Wright therefore bears the burden of proving that he was prejudiced by this potential conflict, or that the alleged conflict was actual because it adversely affected his representation.  However, Wright has failed to satisfy his burden under either standard.

### (ii)     Allegations of Actual Conflict of Interest

Wright contends that in confronting his former client on cross-examination, Martuscello operated under an actual conflict of interest because he was "torn between two loyalties."  Pet. Mem. at p. 10.  According to petitioner, Martuscello did not cross-examine Hill regarding his criminal history because his loyalty to Hill conflicted with his representation of Wright, thereby

19

foregoing the plausible defense theory that Hill "could not be trusted to testify truthfully." *Id.* at pp. 12-14. Wright therefore maintains a "lapse in representation" occurred that adversely affected his defense. *Id.* at p. 14.

Absent evidence to the contrary, it is possible to infer that Martuscello did not probe Hill regarding the extent of his criminal history because he previously represented Hill on past parole violations. However, the testimony adduced at trial suggests otherwise. A careful review of the record reveals that Martuscello conducted a pointed cross-examination in accordance with the defense theory that Hill "could not be trusted to testify truthfully," *see* Pet. Mem. at p. 15, and nothing suggests that a conflict of interest caused Martuscello to forgo any plausible defense strategy during his cross-examination.

Specifically, on direct examination, DA Hoye questioned Hill in detail regarding his past criminal history and prior convictions. Trial Tr. at pp. 1055-57. Thereafter, Attorney Lorman cross-examined Hill by drawing out the details of his plea bargain, including his more lenient sentence. Trial Tr. at pp. 1065-79. Attorney Martuscello then commenced cross-examination by questioning Hill regarding the number of his prior felonies and his parole violations. Trial Tr. at pp. 1082-83. Rather than focus on his past criminal history, Martuscello, like Lorman, also emphasized the benefits of Hill's plea bargain. *See* Trial Tr. at pp. 1086-90. Martuscello elicited the consequences that Hill faced if he failed to testify against Wright and highlighted Hill's belief that his indebtedness to the prosecution survived trial. *See* Trial Tr. at pp. 1086-88. Hill agreed that part of his motivation for testifying was his concern that his failure to do so could affect him in the future because he would be under the supervision of the Division of Parole for the rest of his life. Trial Tr. at p. 1086. Hill also considered the fact that Sharon Cannizzo, his pregnant fiancee, remained on

probation, and any violation could result in her re-sentencing.  Trial Tr. at pp. 1086-87.

By attacking Hill's motives for testifying against Wright, Martuscello suggested to the jury that Hill's credibility was dubious and depended solely on his obtaining a more favorable deal for himself and Cannizzo.  Both Martuscello and Lorman clearly focused on discrediting Hill by probing his motivation to testify, rather than his unreliability as a repeat felony offender.  During his cross-examination, Martuscello obviously was seeking to advance the very defense theory that petitioner now advocates – to prove that Hill was unable to testify truthfully.  *See* Pet. Mem. at p. 15.  Although Martuscello and Lorman could have questioned Hill more rigorously on his criminal history, it appears that counsel considered it a more effective trial strategy to attack Hill's motives for cooperating, especially given that DA Hoye had pursued thoroughly Hill's criminal past on direct examination.  *See Feyrer*, 333 F.3d at 119 (considering counsel's refusal to subpoena a peripheral and reluctant witness as motivated by trial strategy rather than a conflict of interest).  Wright's attempt to establish an adverse effect on his representation by faulting Martuscello's method of cross-examining Hill is nothing more than a criticism of counsel's trial strategy, which cannot be second-guessed by a petitioner on habeas review.  *See, e.g., Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir. 1987) (finding that failure to elicit a witness's prior conflicting grand jury testimony on cross-examination was sound trial strategy); *United States v. Nersesian*, 824 F.2d 1294, 1320-22 (2d Cir. 1987) (holding that decisions whether to call any witnesses on behalf of defendant, whom to call as witnesses, whether to engage in cross-examination, and to what extent to cross-examine are all strategic in nature).  Indeed, given that DA Hoye questioned Hill regarding his past crimes, and Attorney Lorman reminded the jury during summation that Hill's criminal record dated back to 1976, *see* Trial Tr. at pp. 1055-57, 1683, the jury was well-aware of Hill's criminal

past.  As such, Martuscello's cross-examination of Hill in no way prevented the jury from

considering Hill's criminal history, in conjunction with his motives for testifying, in making its

credibility determination.  *See, e.g., United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir.

1990 ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient

to make a 'discriminating appraisal' of the particular witness's credibility.") (quoting *United States*

*v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980), *cert. denied*, 449 U.S. 1034 (1980)).   Accordingly, there

is nothing in the record to suggest that a conflict of interest caused Martuscello to refrain from

pursuing a plausible defense theory, and thereby adversely affected Wright's defense.

     Wright further claims he was adversely affected by the alleged conflict of interest because

Martuscello was forced to "turn on" his former client and appeared to the jury as a "hired gun"

lacking any credibility.  Pet. Mem. at pp. 13, 15-18.  Wright cites to an exchange between

Martuscello and Hill, which he claims was highly prejudicial:

> Q:   How easy is it, Mr. Hill, based upon your experience, for your parole to be
>      violated?
>
> A:   Real easy.
>
> Q:   Real easy, isn't it?
>
> A:   Just have to have a lawyer like you.

Pet. Mem. at p. 16 (citing Trial Tr. at pp. 1083-84).  Immediately following this exchange, the trial

court denied Martuscello's motion for a mistrial.  Trial Tr. at p. 1084.  The record belies Wright's

contentions that this remark destroyed any trust the jury had in Martuscello and crippled the course

of cross-examination despite Hill's consent.  *See* Pet. Mem. at pp. 15-18.  To the contrary,

Martuscello appeared before the jury as an aggressive advocate for Wright, making countless

objections, initiating motions, and conducting thorough examinations of prosecution and defense witnesses.  *See, e.g.,* Trial Tr. at pp. 759-776, 1083-84, 1181-94, 1206-10, 1570-73.  In light of Martuscello's apparent advocacy, Hill's sarcastic comment arguably served to negatively influence his own credibility before the jury rather than that of Martuscello.

Finally, Wright asserts that the trial court's failure to conduct an inquiry to determine whether a conflict actually or potentially existed and whether he was aware of the conflict was a constitutional error mandating habeas relief.  Pet. Mem. at pp. 8-12.  Wright also alleges that he is not required to show the conflict actually harmed his representation because the trial court's lack of inquiry mandates reversal.  *Id.*  Relying on the Southern District of New York's decision in *Sutton v. Strack*, No. 98-CIV-6391, 2001 WL 114316 (S.D.N.Y. Feb. 8, 2001), Wright contends that Hill's consent to cross-examination did not obviate the conflict because the trial court was still required to conduct an inquiry into the conflict.  *Id.* at pp. 10-12.  However, Wright's characterization of the governing law on this issue is blatantly incorrect.

Prior to the Supreme Court's decision in *Mickens v. Taylor*, 535 U.S. 162 (2002), the Second Circuit generally held that a trial court's failure to conduct an inquiry, where it knows or reasonably should know of a conflict, warranted automatic vacatur of the conviction.  *See United States v. Blount*, 291 F.3d 201, 211 (2d Cir. 2002), *cert. denied*, 537 U.S. 1141 (2003).  Indeed, in *Sutton*, a pre-*Mickens* decision, the Southern District of New York mandated reversal of the petitioner's conviction where a witness consented to cross-examination by his former counsel and the trial court failed to engage in any inquiry regarding the potential conflict.  *Sutton*, 2001 WL 114316, at *2.  However, *Mickens* has since clarified that a trial court's failure to inquire does not amount to a constitutional violation unless the defendant establishes the alleged conflict adversely affected

23

counsel's performance.  *Mickens*, 535 U.S. at 173-74; *see also Blount*, 291 F.3d at 211-12 ("In *Mickens v. Taylor*, the Supreme Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, does not automatically require reversal of the conviction.").  Wright's failure to demonstrate such an adverse affect, as noted above, prevents the Court from finding any constitutional merit to his claim that the trial court's lack of inquiry mandates habeas relief.

The record demonstrates that Martuscello's cross-examination of Hill was conducted in accordance with a strategy seemingly employed by both defense counsel, and did not compromise any other plausible defense theory.  The Court perceives no basis on which to conclude that Martuscello's prior representation of Hill had any adverse effect on his representation of Wright.  Wright thus has failed to establish that an actual conflict of interest adversely affected the legal representation provided by Martuscello, as required by *Sullivan* and *Mickens*.  At most, Martuscello faced a non-severe, potential conflict of interest that was diminished or even eliminated by Hill's consent to cross-examination, and Wright has not demonstrated any prejudice resulting from the possible conflict.  Accordingly, the Court of Appeals' determination that Martuscello faced a possible conflict, which was cured by Hill's consent to cross-examination, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  The Court therefore recommends Wright's ineffective assistance of counsel claim based on conflict of interest be denied.

### C.      Claimed Errors of the County Court

#### 1.      Applicable Standard of Review

In his remaining claims, Wright alleges that the trial court (1) deprived him of his federal due process right to be present at all material stages of his trial; (2) improperly failed to disqualify a

tainted juror; and (3) permitted the admission of prejudicial testimony.  Petition, Grounds Two through Four.

When evaluating convictions on collateral habeas challenges alleging error on the part of a trial court, habeas courts historically have inquired whether the trial court's error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *DeVivo v. Superintendent, Auburn Corr. Facility*, No. 02-CV-0840, 2006 WL 581145, at *18 (N.D.N.Y. March 8, 2006) (Kahn, D.J. and Peebles, M.J.) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)) (other citation omitted).  However, following the enactment of the AEDPA, it became an "open question" in the Second Circuit whether the applicable test on federal habeas review of an alleged state trial court error remains the standard articulated in *Brecht* or an analysis of whether the state court's decision was contrary to, or an unreasonable application of *Chapman v. California*, 386 U.S. 18 (1967).[18]  *DeVivo*, 2006 WL 581145, at *18 (citing *Benn v. Greiner*, 402 F.2d 100, 105 (2d Cir. 2005) (citation omitted)); *see also Brinson v. Walker*, 407 F. Supp. 2d 456, 480-81 (W.D.N.Y. 2006); *Moore v. Herbert*, No. 02 CV 0999, 2005 WL 3591815, at *3-4 (N.D.N.Y. Dec. 30, 2005) (Mordue, D.J.).

The Second Circuit resolved part of this question in *Gutierrez v. McGinnis*, 389 F.3d 300 (2d Cir. 2004), by holding that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied *Chapman*. *DeVivo*, 2006 WL 581145, at *18 (citing *Gutierrez*, 389 F.3d at 306 and *Zappulla v. New York*, 391 F.3d 462, 467 (2d Cir. 2004)).  The Second Circuit has not yet decided whether the *Chapman* or

---

[18]     In *Chapman*, the Supreme Court articulated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

*Brecht* test is to be applied where the state court did not perform a harmless error analysis.  *See*

*DeVivo*, 2006 WL 581145, at *18; *see also Howard v. Walker*, 406 F.3d 114, 123 (2d Cir. 2005)

(citing *Gutierrez*) (other citations omitted); *Brinson*, 407 F. Supp. 2d at 480-81; *Crispino v. Allard*,

378 F. Supp. 2d 393, 405-06 (S.D.N.Y. 2005) (citations omitted); *Ellis v. Phillips*, No. 04-CIV-

7988, 2005 WL 1637826, at *24 n.45 (S.D.N.Y. July 13, 2005 ) (Peck, M.J.) (collecting cases),

*adopted*, No. 04-7988, Dkt. No. 33 (S.D.N.Y. Aug. 5, 2005) (Stein, D.J.).

In the present case, the Court of Appeals did not engage in harmless error analysis in

reviewing petitioner's claims alleging trial court error.  *Harris*, 99 N.Y.2d at 212-13.  Instead, the

Court of Appeals determined that petitioner's claims lacked merit, and therefore the trial court had

not erred in any of the challenged rulings.  *Id.*  In view of the uncertainty within this circuit, this

Court  will examine the issues now raised by petitioner regarding these claims utilizing both

standards.

## 2.    Consideration of Wright's Claims in Light of *Chapman* and *Brecht*

### (i)    Right to Be Present at All Material Stages of Trial

In his second ground for relief, Wright argues that the County Court deprived him of his

federal due process right to be present at all material stages of his trial when it conducted a fact-

finding hearing outside his presence into the possible taint of sworn juror Carol Lamb.  Petition,

Ground Two.  Wright claims he had first and secondhand knowledge of facts related to the possible

taint of the juror, and could have assisted his counsel, who was present at the inquiry, in eliciting

information to prove Ms. Lamb's unfitness to serve.  *Id.*  The Court of Appeals affirmed the

Appellate Division's rejection of this claim, reasoning that an *in camera* hearing to determine the

fitness of a sworn juror is merely an ancillary proceeding where the defendant's presence is only

necessary if he has a valuable contribution to his defense.  *Harris*, 99 N.Y.2d at 212 (affirming *Harris*, 288 A.D.2d at 615-16).  According to the Court of Appeals, the presence of both Harris and Wright's defense counsel at the inquiry was sufficient to ensure that the defendants received a "fair and just hearing."  *Id.* (citation omitted).

A criminal defendant's constitutional right to be present at all stages of his trial is rooted in the Confrontation Clause of the Sixth Amendment, and is protected by the Due Process Clause where the defendant does not actually confront the witness against him.  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)).  However, the right is not absolute and is triggered only when the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charges."  *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934), *overruled on other grounds*, *Malloy v. Hogan*, 378 U.S. 1 (1964); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (stating that the due process clause guarantees a criminal defendant "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure").  Where the defendant's absence during a proceeding does not defeat the fundamental fairness of the trial or his ability to defend against the charges, his right to attend the proceeding is not implicated under the due process clause.  *Snyder*, 291 U.S. at 105-06; *see also Gagnon*, 470 U.S. at 526-27.  Further, there is no constitutional right to be present "when presence would be useless, or the benefit but a shadow."  *Snyder*, 291 U.S. at 106-07.  The right to be present during critical stages of trial is circumscribed by harmless error analysis.  *Rushen v. Spain*, 464 U.S. 114, 119 n.2 (1983). In specifically addressing *in camera* discussions with jurors held outside the presence of a defendant, the Supreme Court has emphasized that "'[t]he defense has no constitutional right to be

present at every interaction between a judge and a juror.'" *Gagnon*, 470 U.S. at 526 (quoting

*Rushen*, 464 U.S. at 125-26 (Stevens, J., concurring in judgment)).

Wright complains that, because he was present when Ms. Lamb encountered the female

spectator in the hallway several days after Ms. Lamb provided the woman with a list of places to

stay, he could have been useful during his defense counsel's inquiry of Ms. Lamb by: (1) informing

counsel whether Ms. Lamb's version of the encounter was false, inaccurate or misleading and (2)

recounting Ms. Lamb's "gestures, facial expressions, or other surrounding circumstances concerning

the encounter." Petition, Ground Two; *see also* Pet. Mem. at pp. 22-25.

Wright's argument is unpersuasive for several reasons. First, the inquiry conducted by the

County Court was not necessarily a material stage of the trial at which petitioner had a right to be

present. The Second Circuit has urged that the standard requiring a defendant's presence at all

stages of trial should be applied in a flexible, "common sense" manner. *Clark v. Stinson*, 214 F.3d

315, 322-23 (2d Cir. 2000), *cert. denied*, 531 U.S. 1116 (2001). When the proceeding is a "short

interlude in a complex trial," it is not considered material under the due process clause. *Gagnon*,

470 U.S. at 527. In fact, the Second Circuit has cited with approval the holding of the New York

Court of Appeals that the questioning of a juror outside the defendant's presence does not constitute

a material stage of trial. *See Clark*, 214 F.3d at 322-23 (citing *People v. Mullen*, 44 N.Y.2d 1, 5-6

(1978)); *see also Cruz v. Artuz*, No. 97-CV-2508, 2002 WL 1359386, at *12 (E.D.N.Y. June 24,

2002) (rejecting petitioner's claim he was denied a fair trial because he was not present at trial

court's *in camera* inquiry of three jurors following their encounter with petitioner's eight-year-old

son outside the courtroom because proceeding was not a material stage of the trial).[19]

Moreover, even if the hearing was a material stage of Wright's trial, petitioner has not demonstrated that his absence from the inquiry bore a reasonable relationship to his opportunity to defend.  Although Wright claims he could have assisted Martuscello in questioning Ms. Lamb regarding her second encounter with the female spectator, it is clear that the focus of the hearing was not this second meeting.  Judge Lomanto and all counsel focused on Ms. Lamb's first encounter with the spectator as well as her ability to proceed as a fair and impartial juror.  *See* Trial Tr. at pp. 631-53.  Wright's personal observations of Ms. Lamb's second interaction with the spectator would not have offered any meaningful insight into Ms. Lamb's concerns regarding the incident.  Indeed, given that Ms. Lamb expressed some unease regarding her safety, Wright's presence at the hearing could have hindered the fact-finding process and prevented Ms. Lamb from speaking freely. *See Gagnon*, 470 U.S. at 526 (finding that presence of defendants and their counsel "could have been counterproductive" where court held *in camera*, *ex parte* inquiry of a sworn juror who expressed concern about the defendant's sketching the jury during the proceedings); *United States v. Peterson*, 385 F.3d 127, 138 (2d Cir. 2004) (indicating that *in camera*, *ex parte* conversation between trial judge and sworn juror who informed other jurors, during deliberations, that she believed she had known the defendants in the past, did not require defendants' attendance because, *inter alia*, their "presence may have prevented juror number three from speaking openly"). Moreover, the continuous presence of Wright's counsel during the hearing, and his active

---

[19]   In contrast, courts generally have held that the impaneling of the jury, including the pre-screening of jurors, is considered a material stage of trial at which a defendant has the right to be present.  *See Gomez v. United States*, 490 U.S. 858, 873 (1989); *Tankleff v. Senkowski* 135 F.3d 235, 246 (2d Cir. 1998); *see also Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002).

participation in the questioning, served to *facilitate* the fundamental fairness of Wright's trial.  *See Pellington v. Greiner*, 307 F. Supp. 2d 601, 606 (S.D.N.Y. 2004), *aff'd*, 132 Fed.Appx. 868 (2d Cir. 2005) ("[C]ourts have repeatedly indicated that in most instances, the presence of defense counsel at a conference between a judge and juror adequately protects the defendant's interests.") (citing *United States v. Smith*, 230 F.3d 300 (7th Cir. 2000) and *United States v. Rhodes*, 32 F.3d 867 (4th Cir. 1994)).  Accordingly, Wright has failed to establish that his trial was "thwarted" by his absence from much of the hearing, and that he therefore suffered a deprivation of his due process rights.  *See Gagnon*, 470 U.S. at 526.

In any event, even assuming his absence from the hearing somehow implicated his constitutional right to be present, petitioner waived that right.  "Although trial courts must vigorously safeguard a criminal defendant's right to be present, a defendant may expressly or effectively waive the right."  *United States v. Fontanez*, 878 F.2d 33, 36 (2d Cir. 1989).  A defendant may waive his right to be present as long as the waiver is made knowingly and voluntarily.  *See Clark*, 214 F.3d at 323.  However, a waiver may be implied by the defendant's conduct.  *See id.*; *see also Cohen v. Senkowski*, 290 F.3d 485, 491 (2d Cir. 2002).  "'[O]nly minimal knowledge on the part of the accused is required when waiver is implied from conduct.'"  *Cohen*, 290 F.3d at 491 (quoting *United States v. Nichols*, 56 F.3d 403, 416 (2d Cir. 1995)).  To determine whether an implied waiver was made knowingly, the proper inquiry is "whether the trial court's actions in open court gave [the defendant] sufficient 'minimal' knowledge of the nature and purpose of the [proceeding] to conclude that he waived his right to be present when he did not attend."  *Id.* In addition, "failure to readily object at the time the decision is made to proceed without the accused can constitute a waiver."  *Clark*, 214 F.3d at 323-34 (citing *Gagnon*, 470 U.S. at 528-29 (finding

30

that defendant waived his right to be present at *in camera* hearing when no objection was made at trial)).  As the Second Circuit summarized, "when a defendant is fully apprised of the nature of the . . . procedure, makes no objection to the procedure, and has counsel present for the duration of the [procedure], a knowing waiver of the right to be present occurs."  *Cohen*, 290 F.3d at 492.

In the instant case, Wright ignores the fact that he was present for at least part of the hearing wherein counsel recounted the questioning of Ms. Lamb and the other jurors, and argued their mistrial motions.  *See* Trial Tr. at pp. 682-690.  At that point, Wright wholly failed to lodge any objections, to assert the need for further questioning, or to supplement the fact-finding process.  *See United States v. Jones*, 381 F.3d 114, 122 (2d Cir. 2004) (holding that defendant waived his right to be present when he "never objected to his absence from the in-chambers hearing, even though he was present during the subsequent hearing in open court when the court made its ruling"); *Pounce v. McLaughlin*, No. 04 CV 668, 2004 WL 2360037, at *8 (E.D.N.Y. Oct. 20, 2004) (finding that defendant's presence in the court when the trial judge announced juror would remain was a "sufficient opportunity" for him to object to his absence during articulation of "for cause" and peremptory challenges).  There is no evidence in the record that Wright was precluded from offering such insight to his counsel, or that he was prohibited from directly addressing the court, prior to the court's decision regarding the mistrial motions.  Moreover, defense counsel did not object at any point to the absence of the defendants during the meeting conducted by Judge Lomanto.  *See* Trial Tr. at p. 631.  The silence of both Martuscello and petitioner accordingly resulted in an implicit waiver of any right to be present. *See Gagnon*, 470 U.S. at 529; *see also Peterson*, 385 F.3d at 138-39 (holding that defendants waived any right they may have had to attend *in camera* inquiry of potentially tainted juror where counsel agreed to judge's suggestion to conduct questioning absent

31

counsel and defendants, and stating that "[a] rule allowing the defendants, as well as their trial counsel, to stay silent at trial and then claim . . . that their absence constitutes reversible error will only encourage 'sandbagging'"); *Jones*, 381 F.3d at 122 (finding waiver of right to be present where defendant and his counsel had an opportunity to raise an objection to the *in camera* conferences, but failed to raise the issue until appeal); *Pellington*, 307 F. Supp. 2d at 605-06 (finding implicit waiver although petitioner "did not expressly or personally waive his right to attend juror conference" where he was aware of the conference and "neither [petitioner] nor his counsel objected to [petitioner's] absence").

Wright's failure to participate in the hearing indicates to this Court that, contrary to his contentions, he had nothing to offer that would have affected the outcome.  *See Clark*, 214 F.3d at 327 (stating that "the absence of any contemporaneous objection is strongly suggestive that the absence was acceptable to [defendant] at the time").  As such, Wright's current argument appears to be nothing more than speculative assertions set forth in a contrived effort to establish that his presence would have affected the course of the trial.  *See, e.g., Pellington*, 307 F. Supp. 2d at 606-07 (rejecting petitioner's argument that his absence from meeting between court, defense attorneys, and juror denied him due process where petitioner had opportunity to speak with his counsel and the court prior to the court's determination of the issue).

Petitioner has failed to establish that his exclusion from the trial court's *in camera* inquiry of jury members deprived him of any constitutional due process right.   Accordingly, he is unable to demonstrate that his exclusion from the conference was an error that had a substantial and injurious effect or influence in determining the jury's verdict, or alternatively, constituted an error that was

not harmless beyond a reasonable doubt.[20]   The Court therefore recommends dismissal of ground

two of Wright's petition.

**(ii)**     **Juror Disqualification**

In the third ground of his petition, Wright alleges that the County Court erred in refusing to

disqualify juror Carol Lamb.  Petition, Ground Three; Pet. Mem. at pp. 25-27.  Wright further

claims that Judge Lomanto failed to engage in a thorough inquiry to determine whether other

members of the jury pool had been tainted by Ms. Lamb's concerns.  Pet. Mem. at pp. 26-27.

According to petitioner, the trial court error resulted in the denial of his right to a fair and impartial

jury.  Petition, Ground Three; Pet. Mem. at p. 25.  The New York Court of Appeals affirmed the

Appellate Division's rejection of this claim.  *Harris*, 99 N.Y. 2d at 212-13; *see also Harris*, 288

A.D.2d at 616.  The Court of Appeals held that:

> In this case, there is no indication that the juror's concern for her personal safety
> rendered her grossly unqualified to serve.  While the juror felt a "teeny bit of concern
> for safety" based on a discrete incident that occurred before she was sworn, she
> assured the court that she would not allow her concern to play any part in her verdict.
> The court inquired if she could convince the attorneys, "that this situation that you've
> described has no impact on you and that you can absolutely sit in the jury box and
> keep an open mind and listen to the evidence and base your verdict solely on the
> evidence."  The juror unequivocally responded, "Yes."  The court made a probing
> and tactful inquiry into the juror's concerns and correctly determined that the juror
> was not grossly unqualified to serve.

*Harris*, 99 N.Y.2d at 213.

The Sixth Amendment of the United States Constitution guarantees individuals the right to a

---

[20]  To the extent that Wright asserts that his federal due process right to be present at all material
stages of his trial was violated, as opposed to alleging trial court error for excluding him from the
conference, the Court further finds that, for the reasons stated above, the Court of Appeals' decision
rejecting this claim was not contrary to, or an unreasonable application of, clearly established Supreme
Court precedent as articulated in *Snyder* and its progeny.

33

trial by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968). "The right to a fair trial . . . has been called 'the most fundamental of all freedoms.'" *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 586 (1976) (Brennan, J., concurring) (quoting *Estes v. Texas*, 382 U.S. 532, 540 (1965)). "It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression." *Id.* at 586 (citing *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963)); *see also United States v. Alvarez-Machain*, 504 U.S. 655, 661-62 (1992) (stating that due process of law is satisfied "when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards") (citation omitted); *Taylor v. Hayes*, 418 U.S. 488, 501-02 (1974). A trial court's finding of juror impartiality may be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). Indeed, a trial court's conclusion that a jury was impartial is subject to a "presumption of correctness."[21] *Id.* at 1037-38 (citing *Rushen*, 464 U.S. at 120); *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 813 (2d Cir. 2000) ("On § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial."); *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995), *cert. denied*, 515 U.S. 1136 (1995) (citation omitted).

Accordingly, a petitioner claiming that his right to a fair trial was violated due to misconduct on the part of a juror bears a heavy burden. He must establish not only that the juror possessed a preconceived notion about the petitioner's guilt, but also that the juror could not "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v.*

---

[21] This presumption of correctness is codified at 28 U.S.C. § 2254(e)(1), which requires that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

*Dowd*, 366 U.S. 717, 723 (1961).  Whether a juror is impartial is a matter "of historical fact:  did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."  *Patton*, 467 U.S. at 1036-37; *see also Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (asserting that trial judge's determination regarding a juror's impartiality is a factual determination by the trial court) (citation omitted).  This "determination is essentially one of credibility, and therefore largely one of demeanor[,] . . . the trial court's resolution of such questions is entitled . . . to 'special deference.'" *Patton*, 467 U.S. at 1038 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984)); *see also Black v. Goord*, 419 F. Supp. 2d 365, 375 (W.D.N.Y. 2006) ("[A] federal court sitting in habeas review is not permitted to redetermine the state trial court's factual findings regarding the credibility of jurors whose demeanor has been observed by the trial court – and not by the habeas court – and must more than simply disagree with the state court in order to reach a different result.") (citing *Patton*, 467 U.S. at 1037).  Thus, the question for the habeas court is "whether there is fair support in the record" for the state court's determination that the challenged juror would be impartial.  *Patton*, 467 U.S. at 1038.

Based on the relevant law and the *in camera* inquiry of Ms. Lamb, juror Sharon Benson, and others, the trial court concluded that no juror misconduct occurred and disqualification of Ms. Lamb was not warranted.  Trial Tr. at pp. 690-91.  In making this determination, Judge Lomanto followed New York Criminal Procedure Law § 270.35(1), which allows a trial court to dismiss a juror from service prior to a verdict if the "juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature."  N.Y. Crim. Proc. Law § 270.35(1).  To make such a finding, the trial court must engage in a "'probing and tactful inquiry'" on the record where it "'carefully

35

consider[s] the juror's answers and demeanor to ascertain whether her state of mind will affect her deliberations.'" *Booker v. Girdich*, 262 F. Supp. 2d 264, 268 (S.D.N.Y. 2003) (quoting *People v. Buford*, 69 N.Y.2d 290, 299 (1987)). Petitioner's claim that Judge Lomanto conducted a "truncated" inquiry simply is belied by the record. Pet. Mem. at p. 27. Judge Lomanto engaged in a rigorous examination of Ms. Lamb, Ms. Benson, and several male jurors in order to determine that Ms. Lamb would remain impartial. *See* Trial Tr. at pp. 631-82.

Namely, Ms. Lamb informed the court and counsel that her encounter with a woman apparently acquainted with the defendants "wouldn't change the way I would vote or my impartiality at all." Trial Tr. at p. 636. She further stated that the incident "could possibly . . . make me feel a little more concerned for safety in the future. But I don't think that's a valid thing to base decisions on." Trial Tr. at p. 636. As noted by the New York Court of Appeals, *see Harris*, 99 N.Y. 2d at 213, when asked by Judge Lomanto whether she could "reassure the District Attorney and [defense counsel] that this situation that you've described has no impact on you and you can absolutely sit in the jury box and keep an open mind and listen to the evidence and base your verdict solely on the evidence," Ms. Lamb clearly responded "Yes." Trial Tr. at p. 637. Moreover, when questioned by Attorney Lorman regarding whether the encounter "in any way compromise[d] your feeling as sitting as a juror in this case," Ms. Lamb replied "No." Trial Tr. at p. 642. Ms. Lamb assured Attorney Martuscello that "[t]he only thing that will be on my mind a little bit is the safety. . . . And I'm not going to make a decision to step off this because of that. That's not valid in my mind to do that." Trial Tr. at p. 648. Further, when asked by DA Hoye of her ability to remain on the jury in light of her small amount of her concern for safety, Ms. Lamb responded "Yes. I can promise you that." Trial Tr. at pp. 650-51. Ms. Lamb then agreed with DA Hoye's statement that

sitting as a juror in any criminal case would cause her to have some concern for her safety.  Trial Tr. at p. 651.  Ms. Benson also stated that she was able to remain impartial despite discussing the encounter with Ms. Lamb.  Trial Tr. at p. 656.  After questioning several male jurors *in camera* and polling all male jurors, the court was satisfied that the jury, including Ms. Lamb, remained impartial and no juror misconduct occurred.  *See* Trial Tr. at pp. 672-82, 690-91.

The record amply supports the trial court's finding, and the Court finds nothing to indicate that Judge Lomanto committed manifest error in concluding that Ms. Lamb was qualified to remain on the jury.  Judge Lomanto was within his discretion to determine that Ms. Lamb was credible in her unequivocal assertions that she could remain impartial.  Judge Lomanto further exercised his discretion in concluding that Ms. Benson and the other questioned jurors were credible in their representations.  *See, e.g., Thomas v. Fischer*, No. 03 Civ. 5388, 2004 WL 725636, at *7-8 (S.D.N.Y. Apr. 5, 2004) (finding that the trial court acted within its "wide discretion" in determining the jury was impartial given its "unique ability to personally observe the jurors in question") (citation omitted).  Moreover, the inquiry conducted by Judge Lomanto was sufficiently probing and tactful to determine the potential for bias and prejudice.  Wright has failed to set forth any evidence, let alone clear and convincing, to rebut the presumption of correctness afforded the trial court decision.  Since petitioner has not established by clear and convincing evidence that the trial court's determination constituted error, *a fortiori* he has failed to demonstrate that this alleged trial court error had a substantial and injurious effect or influence in determining the jury's verdict, or, alternatively, that the claimed error was not harmless beyond a reasonable doubt.[22]  Accordingly,

---

[22]  To the extent that Wright asserts that his constitutional right to a fair and impartial jury was violated, as opposed to alleging trial court error for failing to disqualify Ms. Lamb, the Court further finds that, for the reasons stated above, the Court of Appeals' decision rejecting this claim was not contrary to, or

this Court recommends that ground three of Wright's petition be denied.

### (iii)   Evidentiary Errors

In his fourth ground for relief, Wright alleges that erroneously admitted evidence violated his constitutional right to a fair trial. Petition, Ground Four; Pet. Mem. at pp. 27-31. Specifically, petitioner claims that the testimony of Sharon Cannizzo and James Hill, wherein they stated that their appearance at trial jeopardized their safety, "poisoned" the trial. Pet. Mem. at pp. 27-28. Wright contends that this testimony prejudiced him because it allowed the jury to infer that Wright "posed a threat" to the witnesses. Pet. Mem. at p. 28. According to Wright, the prejudice was compounded by the prosecutor's reference in summation to Wright and Harris as "professional" drug dealers, which implied that they were capable of inflicting harm on others. Pet. Mem. at pp. 30-31. Further, Wright claims the trial court failed to minimize the prejudice by providing the jury with a limiting instruction. Pet. Mem. at pp. 30-31. The Court of Appeals found these contentions "without merit." *Harris*, 99 N.Y.2d at 213.

First, Wright claims that Cannizzo's testimony regarding her reluctance to divulge her place of employment was unduly prejudicial and should not have been admitted at trial. In this regard, Martuscello asked Cannizzo where she was employed, to which Cannizzo responded "I'd rather not disclose that. I don't feel I need to. Why do I need to disclose where I'm working at this time?" Trial Tr. at p. 883. An off-the-record sidebar was then held. Trial Tr. at pp. 883-84. After the conference, Judge Lomanto asked Cannizzo, "[I]s there a reason why you do not want to answer the question as to where you're working?" Trial Tr. at p. 884. Judge Lomanto overruled Martuscello's

---

an unreasonable application of, clearly established Supreme Court precedent as articulated in *Patton* and its progeny.

objection to his question, and Cannizzo responded "[f]or my own personal safety."  Trial Tr. at p. 884.  Martuscello's subsequent motion for a mistrial was denied.  Trial Tr. at p. 884.

Second, Wright objects to Hill's testimony wherein he stated he "could get killed" for testifying.  *See* Trial Tr. at p. 1091.  Specifically, Hill testified that he entered into a cooperation agreement with the prosecution in which he agreed to testify against Wright and Harris and to plead guilty to narcotics charges relating to the drug activities with the co-defendants and Cannizzo.  Trial Tr. at pp. 1065-68.  Hill stated that he was currently incarcerated in accordance with his guilty plea.  Trial Tr. at pp. 1066-68.  In an apparent effort to cast doubt on the credibility of his testimony, Martuscello and Lorman extensively cross-examined Hill regarding the plea deal and his motives for testifying.  *See* Trial Tr. at pp. 1065-1090.  Accordingly, on redirect, DA Hoye asked Hill whether he had considered the consequences of testifying, to which he replied there was "a whole bunch of consequences. . . I could get killed.  This isn't a favorable act where I live."  Trial Tr. at p. 1091.  Notably, Wright did not object to this testimony.  *See* Trial Tr. at p. 1091.

While the introduction of prejudicial evidence against a defendant in a criminal trial may be contrary to state or federal law, such admissions warrant habeas relief only in limited circumstances.  *See Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998).  In order to prevail on a habeas claim that an evidentiary error resulted in a constitutional violation, a petitioner must establish the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'"  *Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *see also Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985) (stating that improperly admitted evidence results in a due process violation only if "the error was so pervasive as to have denied [the petitioner] a fundamentally fair trial").  The erroneously admitted evidence must have been

39

"'sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)); *see also Collins*, 755 F.2d at 19 (stating that the evidence must be "crucial, critical, highly significant") (quotation omitted).  When assessing the materiality of the evidence, a habeas court should consider "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case."  *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000); *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 268 (S.D.N.Y. 2002), *aff'd*, 66 Fed.Appx. 277 (2d Cir. 2003).  A court should review the evidence in light of the entire record presented to the jury.  *Dunnigan*, 137 F.3d at 125.

Nothwithstanding the failure of Judge Lomanto to provide a limiting instruction regarding the testimony of Hill and Cannizzo, it is doubtful that the admission of this testimony can be deemed erroneous.  Neither Hill nor Cannizzo testified that they were "afraid of testifying" against petitioner, linked their concerns with either of the defendants, or stated that they had received threats from the defendants.  *See* Pet. Mem. at p. 28.  In fact, Hill testified on direct examination that he resided in a New York State Correctional Facility, and his reference to his testimony not being looked upon favorably "where [he] live[d]" likely referenced the disdain of prison inmates toward "snitches," rather than any fear of reprisal by petitioner.  *See* Trial Tr. at p. 1091; *see also People v. Edwards*, 261 A.D.2d 260, 261 (1st Dept. 1999) (finding that trial court properly permitted testimony from an incarcerated prosecution witness that fellow inmates had called him a "snitch" because of his cooperation with the government and that witness feared reprisals); *Harris*, 288 A.D.2d at 617 (noting that "Hill's remarks did not imply a fear of retaliation by defendants and was clearly a reference to his inmate status").  Moreover, the challenged testimony of Hill and Cannizzo

40

was relevant to their state of mind and their motivation for entering into a plea deal.  *See id.*[23]

"Since a major theme of [petitioner's] attack on [the witnesses'] credibility was that [they were]

testifying out of self-interest, in an effort to obtain lenient treatment," the trial court properly

exercised its discretion in receiving specific testimony that "such cooperation was also against the

[witnesses'] interest to a significant extent."  *Edwards*, 261 A.D.2d at 261.  In addition, while

Attorney Martuscello objected to Cannizzo's testimony and his subsequent motion for a mistrial

was denied, *see* Trial Tr. at p. 884, his failure to object to Hill's testimony or even to request a

curative instruction seriously undermines petitioner's prejudice claim.  *See, e.g., Rojas v. Senkowski*,

No. 95-CV-1866, 1996 WL 449321, at *4 (E.D.N.Y. July 29, 1996) (citation omitted) (stating that

defense counsel's failure to object to the allegedly improper remark of the prosecutor "undermines

the seriousness of petitioner's claim of error").

Even assuming, *arguendo*, that the challenged testimony of Hill and Cannizzo was

erroneously admitted at trial without a proper limiting instruction, Wright has failed to establish that

the evidence was sufficiently material to his conviction and thereby resulted in a fundamentally

unfair trial.  The testimony provided by Hill and Cannizzo was not "crucial, critical, or highly

significant" and certainly was not probative of Wright's guilt or innocence.  *See Collins*, 755 F.2d at

19.  Based on a review of the trial record, Hill and Cannizzo's testimony neither provided the basis

for Wright's conviction nor would reasonable doubt have existed on the record without it.  *See*

*Dunnigan*, 137 F.3d at 125.

---

[23]  Based on a review of the cross-examinations of both Hill and Cannizzo, it is clear that during the
colloquy preceding the challenged testimony, defense counsel were seeking to adduce testimony related to
the witnesses' state of mind in order to attack their credibility, as opposed to eliciting facts upon which the
jury would base its verdict.  *See* Trial Tr. at pp. 880-83, 1065-1079.

Rather, the evidence adduced at trial implicating Wright in the drug ring was overwhelming. In addition to the compelling testimony of Hill and Cannizzo regarding petitioner's involvement in the drug sales, several other witnesses placed two African American men at the residence during drug purchases and identified an Isuzu Trooper, which was linked to Harris and Wright, in the driveway at those times.  Trial Tr. at pp. 11008-09, 104, 1161-63, 1230-33, 1602.  Moreover, when law enforcement raided the residence on April 3, 1996, Wright was found on the premises in possession of $3646 and a pager, which served to corroborate the testimony of Hill and Cannizzo that they contacted Wright and Harris by beeper when customers arrived at the residence in the two men's absence.  RA24-26; Trial Tr. at pp. 791-94, 798-803, 1041-44.  At that time, a search of the residence revealed 5.6 ounces of cocaine, an electronic scale, razor blades, plastic bags and duct tape in the bedroom from which Wright and Harris allegedly operated.  Trial Tr. at pp. 1283, 1321-22, 1494-95.  The strength of the prosecution's case is readily apparent, and petitioner has failed to demonstrate that this alleged trial court error had a substantial and injurious effect or influence in determining the jury's verdict, or, alternatively, that the claimed error was not harmless beyond a reasonable doubt.  *See Wray*, 202 F.3d at 526 ("[T]he strength of the prosecution's case 'is probably the single most critical factor in determining whether error was harmless.'") (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (internal quotations omitted), *cert. denied*, 514 U.S. 1006 (1995)).  Accordingly, the Court cannot conclude that this testimony so infected petitioner's trial with unfairness as to make his conviction on the charges in the Indictment a denial of his right to a fair trial.

Wright's claim that DA Hoye exacerbated the alleged prejudice by characterizing the

42

defendants as "professionals" in her summation likewise is insufficient to warrant habeas relief.[24]
*See* Trial Tr. at pp. 1720-21.  Prosecutorial misconduct violates a petitioner's due process rights
when the misconduct alleged is so severe and is of sufficient significance to infect the trial, resulting
in the denial of the petitioner's right to a fair trial.  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citing
*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Blissett v. LeFevre*, 924 F.2d 434, 440 (2d
Cir. 1991).  To prevail on a claim of prosecutorial misconduct based on an allegedly improper
summation, a petitioner must demonstrate that "'he suffered actual prejudice because the
prosecutor's comments during summation had a substantial and injurious effect or influence in
determining the jury's verdict.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting
*Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994), *cert. denied*, 516 U.S. 1152 (1996)); *see also*
*Suriel v. Burge*, No. 04 CV 3451, 2006 WL 2583203, at *6 (E.D.N.Y. Sept. 6, 2006) (noting that for
a prosecutor to violate constitutional due process during summation, his conduct must be
egregious); *Ramirez v. Poole*, No. 03-CV-5202, 2005 WL 1123775, at *9 (E.D.N.Y. May 9, 2005)
(quoting *Bentley*).  "Under New York law, statements during summation are permissible if they
constitute a 'fair comment on the evidence' at trial and reasonable inference therefrom, or a 'fair
response to remarks made by the defense counsel during summation.'"  *Roman v. Filion*, No. 04
Civ. 8022, 2005 WL 1383167, at *18 (S.D.N.Y. June 10, 2005) (Peck, C.M.J.) (quotation and
citation omitted), *adopted*, No. 04-8022, Dkt. No. 16 (S.D.N.Y. Dec. 20, 2005) (Wood, D.J.); *see*
*also Tolliver v. Greiner*, No. 02 CV 0570, 2005 WL 2179298, at *13 (N.D.N.Y. Sept. 8, 2005)

---

[24]  Wright does not appear to assert this claim of prosecutorial misconduct as an independent ground
for habeas relief.  Rather, he complains of the prosecutor's comments during summation in order to buttress
his claims of evidentiary error.  For purposes of completeness, the Court nonetheless will examine this
allegation independently.

(Treece, M.J.), *adopted*, 2005 WL 2437021 (N.D.N.Y. Sept. 30, 2005) (Kahn, D.J.).

By characterizing petitioner as a "professional," DA Hoye simply challenged defense counsel's theory, as articulated in his summation, that since no testimony definitively placed Wright at Hill's residence during the relevant time period, he was never involved in any drug transactions. *See* Trial Tr. at pp. 1660-61, 1664-69.  In a fair response to this defense theory, DA Hoye used the term "professional" to argue that Wright and Harris knew exactly what they were doing by conducting their drug business anonymously, using Hill and Cannizzo as the visible faces of the business.  *See* Trial Tr. at pp. 1698-99, 1720-21.  Contrary to petitioner's rather theatrical assertions, the prosecutor's comments, examined in their proper context, in no way connote that Wright and Harris had "the wherewithal and willingness to inflict mayhem and death upon their enemies."  *See* Pet. Mem. at p. 30.  This Court therefore cannot conclude that the prosecutor's remarks were so prejudicial as to deprive Wright of a fair trial.

Accordingly, the Court recommends that ground four of Wright's petition be denied in its entirety.

**WHEREFORE**, based upon the foregoing, it is hereby

**RECOMMENDED**, that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

<u>**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**</u>.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)).

Dated: March 16, 2007
      Syracuse, New York

George H. Lowe
United States Magistrate Judge